1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TRAVIS WILLIAM COLEMAN,

                              Petitioner,

          v.

PATRICK GLEBE,

                              Respondent.

CASE NO. C14-0050-JLR-MAT

REPORT AND RECOMMENDATION

INTRODUCTION

Petitioner Travis William Coleman proceeds *pro se* in this habeas corpus matter pursuant to 28 U.S.C. § 2254.  He challenges a 2008 King County Superior Court judgment and sentence (Dkt. 31, Ex. 1) and raises three grounds for relief in his habeas petition (Dkt. 3).  After the Court denied respondent's motion to dismiss based on a time-bar under 28 U.S.C. § 2244(d)(1) (Dkt. 26), respondent submitted an answer to the petition, along with relevant portions of the state court record (Dkts. 28, 31).

The Court has now considered the record relevant to the grounds raised in the petition.  For the reasons discussed herein, it is recommended that petitioner's habeas petition be DENIED

REPORT AND RECOMMENDATION
PAGE - 1

1   and this case DISMISSED.

2                          BACKGROUND

3   The Washington Court of Appeals summarized petitioner's case as follows:

4           When TMB was nine years old, he lived for a time with his
     grandparents and Coleman.  When he returned to live with his
5   mother, he disclosed that Coleman had sexually abused him on
     numerous occasions.  His mother immediately contacted the
6   police.

7           TMB described the abuse to his mother, to a child
     interview specialist, and to a pediatrician trained in sexual abuse
8   cases.  He indicated that Coleman had engaged him in viewing
     child pornography, kissing with tongues, mutual masturbation, and
9   oral sex.  The abuse first occurred during a family trip to a cabin,
     and regularly thereafter while TMB resided with Coleman (20 to
10  40 times in all).

11          The State charged Coleman with one count of rape of a
     child in the first degree and three counts of first degree child
12  molestation.  All counts had the same charging period.  Because
     the incident at the cabin occurred in another county, it was not
13  included among the charges.

14          At trial, the State introduced recordings of TMB's
     interviews with the investigator and pediatrician.  TMB's live
15  testimony differed from these recorded statements.  For example,
     TMB testified he thought the abuse only happened three times,
16  including the time at the cabin, and he denied that he ever touched
     Coleman's penis.  TMB testified that he was embarrassed to be in
17  court and found it tough to talk about the abuse.

18          The jury convicted Coleman of two counts of molestation,
     acquitted him of the third, and did not reach a verdict on the rape
19  charge. . . .

20  (Dkt. 31, Ex. 7 at 1-2.)

21          Petitioner was sentenced to an indeterminate term of seventy-eight months to life in total

22  confinement, followed by community custody.  (*Id.*, Ex. 1.)  He was confined at the Stafford

23  Creek Corrections Center at the time he filed his petition, was thereafter released from

REPORT AND RECOMMENDATION
PAGE - 2

incarceration, and is currently under community custody.  (*Id*., Ex. 2.)

Petitioner filed a direct appeal of his conviction in the Washington Court of Appeals. (*Id*., Ex. 4.)  On August 17, 2009, the Court of Appeals issued an opinion in which it concluded the trial court erred in its procedure for sealing jury questionnaires, but did not find the error structural and remanded the matter to the trial court for reconsideration of the sealing order.  (*Id*., Ex. 7.)   The court otherwise rejected petitioner's claims and affirmed the trial court.   (*Id*.) Petitioner did not seek further review by the Washington Supreme Court, and the Court of Appeals issued its mandate on September 25, 2009.  (*Id*., Ex. 8.)

The trial court held a hearing on the issue remanded from the Court of Appeals in November 2009.  (*Id*., Ex. 9.)  The court modified its prior order sealing the jury questionnaires, directing that the names and juror numbers be redacted and the redacted questionnaires filed. (*Id*.)  Petitioner thereafter appealed the order of the trial court to the Court of Appeals.  (*Id*., Ex. 10.)  The appellate court, on April 4, 2011, affirmed the trial court's order on remand.  (*Id*., Ex. 3.)  Petitioner petitioned for review (*id*., Ex. 13) and the Washington Supreme Court denied the petition without comment on June 5, 2013 (*id*., Ex.14).  The Court of Appeals issued its mandate on June 26, 2013.  (*Id*., Ex. 15.)

Petitioner had, in the meantime, filed a personal restraint petition in the Court of Appeals. (*Id*., Ex. 16.)  The court dismissed the petition.  (*Id*., Ex. 19.)  Petitioner moved for discretionary review (*id*., Ex. 10), and the Acting Commissioner of the Washington Supreme Court issued a ruling denying review (*id*., Ex. 21).  Petitioner moved to modify the ruling (*id*., Ex. 22) and the court denied the motion without comment on February 5, 2014 (*id*., Ex. 23).  The Washington Court of Appeals thereafter issued its certificate of finality on February 21, 2014.  (*Id*., Ex. 24.)

/ / /

REPORT AND RECOMMENDATION
PAGE - 3

1

<u>DISCUSSION</u>

2

Petitioner here raises three grounds for relief:

3

4

1.      Mr. Coleman was denied his Sixth Amendment right to a public trial when the trial court sealed juror questionnaires without first conducting any inquiry into Mr. Coleman's public trial rights.

5

6

7

2.      Mr. Coleman was denied effective assistance of counsel as guaranteed under the Sixth Amendment to the United States Constitution when his attorney failed to object to numerous improper remarks made by the prosecution during presentation of its closing argument.

8

9

10

3.      Mr. Coleman's Fifth and Fourteenth Amendment rights were violated where the prosecution failed to provide possible exculpatory evidence when it failed to provide defense counsel with a mirror image of a hard drive seized from Mr. Coleman's residence which was alleged to contain "footprints of child pornography."

11

12

(Dkt. 3 at 5-9.)

13

Respondent avers that petitioner properly exhausted his state court remedies within the

14

meaning of 28 U.S.C. § 2254(b).   Finding no basis to disagree, the Court proceeds to

15

consideration of petitioner's habeas claims on the merits.

16

A.      <u>Habeas Standard</u>

17

Federal habeas corpus relief is available only to a person "in custody in violation of the

18

Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  A habeas corpus

19

petition may be granted with respect to any claim adjudicated on the merits in state court only if

20

the state court's decision was contrary to or involved an unreasonable application of clearly

21

established federal law, as determined by the United States Supreme Court.  § 2254(d)(1).  In

22

addition, a habeas corpus petition may be granted if the state court decision was based on an

23

unreasonable determination of the facts in light of the evidence presented in the state court

REPORT AND RECOMMENDATION
PAGE - 4

proceeding.  § 2254(d)(2).

Under the "contrary to" clause of § 2254(d)(1), a federal habeas court may grant the writ only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal habeas court may grant the writ only if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.  *Id*. at 412-13.  The Supreme Court has made clear that a state court's decision may be overturned only if the application is "objectively unreasonable."  *Lockyer v. Andrade*, 538 U.S. 63, 69 (2003).

In considering a habeas petition, this Court's review "is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, __ U.S. __, 131 S. Ct. 1388, 1398-1400, 1415 (2011).  If a habeas petitioner challenges the determination of a factual issue by a state court, such determination shall be presumed correct, and the applicant has the burden of rebutting the presumption of correctness with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

B.    Habeas Claims

1.    Ground One:

In his first ground for relief, petitioner challenges the sealing of the juror questionnaires by the trial judge without first conducting a proper inquiry.  Petitioner maintains this violated his Sixth Amendment public trial rights.

The Sixth Amendment provides criminal defendants the right to a public trial.  U.S. Const. amend. VI.  The public trial right extends to voir dire proceedings.  *Waller v. Georgia*,

REPORT AND RECOMMENDATION
PAGE - 5

467 U.S. 39, 45 (1984) (citing *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501 (1984)).  It was created for the benefit of defendants, and allows for the public to see that the accused is treated fairly, helps ensure that the judge and prosecutor carry out their duties responsibly, encourages witnesses to come forward, and discourages perjury.  *Id.* at 46; *U.S. v. Sherlock*, 962 F.2d 1349, 1356 (9th Cir. 1989).

The right to a public trial is not absolute.  It "may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information."  *Waller*, 467 U.S. at 45.

With a partial closure of a trial, a reviewing court must determine whether there was a "substantial" reason.  *Sherlock*, 962 F.2d at 1357.[1]  The court must also look to whether the closure was narrowly tailored to fit the substantial reason.  *Id.*; *see also Waller*, 467 U.S. at 45.  The reason must be "'articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.'"  *Waller*, 467 U.S. at 45 (quoting *Press-Enterprise Co.*, 464 U.S. at 510).

The trial court must also satisfy three procedural requirements.  *Sherlock*, 962 F.2d at 1358.  The trial court must (1) hold a hearing on the closure motion; (2) make findings to support the partial closure; and (3) consider reasonable alternatives to closing the courtroom.  *Id.* at 1358-59.  The first procedural requirement is met when the court gives the defendant the right to be heard.  *Id.* at 1358.

In this case, after excusing a number of jurors for undue hardship, the trial judge issued

---

[1] In *Sherlock*, 962 F.2d at 1356-57, the Court of Appeals for the Ninth Circuit drew a distinction between full and partial closures.  The Court found the United States Supreme Court's decision in *Waller* addressed total closures of a trial court proceeding, and did not necessarily govern partial closures.  *Id.* at 1356.  The Court held that the more lenient "substantial reason" standard applied to partial closures, rather than the "overriding interest" standard set forth in *Waller*.  *Id.* at 1357.

REPORT AND RECOMMENDATION
PAGE - 6

questionnaires to the remaining jurors.   (Dkt. 31, Ex. 25 at 9-18.)   As later described by the

Washington Court of Appeals:

> The questionnaire posed mostly "yes" or "no" questions concerning experience with sex crimes.   Specially, prospective jurors were asked whether they or anyone close to them had been accused of, witness to, or a victim of a sex crime.   Jurors answering "yes" were asked whether the perpetrator was known and whether the matter was referred to a government agency.   The questionnaire also asked whether jurors had specialized training concerning sex crimes or counseling and whether anyone had ever reported being the victim of a sex crime to them.   Finally, the questionnaire asked whether there was any reason the jurors could not be fair in a sex crime case, with room for an explanation, and whether the jurors would prefer to answer additional questions outside the presence of fellow jurors.

(*Id*., Ex. 3 at 2.)   The prosecutor, defense counsel, and trial judge thereafter individually questioned seven jurors who requested private questioning.   (*Id*., Ex. 25 at 20-57.)   The questioning occurred in the open public courtroom, with the remaining jurors either excused for the day or waiting in the jury room for their turn at questioning.   (*Id*. at 21-26.)

The first juror had been sexually assaulted by a family member.   (*Id*. at 21-28.)   Defense counsel later exercised a peremptory challenge against this juror.   (*Id*. at 215.)   The second juror had a foster son whom she believed had been falsely accused of sexual assault.   (*Id*. at 29-33.)   The prosecutor later used a peremptory challenge for cause against this juror.   (*Id*. at 215.)   The third juror stated both she and her daughter had been victims of sex crimes.   (*Id*. at 34-36.)   This juror was never seated in the jury box.   The fourth juror, who was also never seated in the jury box, was the victim of date rape as a teenager, and also reported her mother had been a victim of sexual abuse by a family member as a child.   (*Id*. at 36-37.)   The fifth juror stated her boyfriend's grandson and step-grandson had been victims of sex crimes when they were children.   (*Id*. at 38-41.)   The prosecutor later exercised a peremptory challenge against this juror. (*Id*. at 217.)   The

REPORT AND RECOMMENDATION
PAGE - 7

sixth juror had close friends with a child who had been sexually victimized and expressed doubt about his ability to be fair.  (*Id*. at 42-47.)  This juror was excused for cause.  (*Id*.)  Finally, the seventh juror, who was also excused for cause, had been sexually abused for a "couple years," starting at age thirteen, and had concerns about her ability to be fair.  (*Id*. at 48-50.)

The court proceeded to conduct general voir dire in open court and to select a jury.  (*Id*. at 52-219.)   Three days after the jury was selected, the trial judge, sua sponte, ordered the questionnaires sealed and made the following finding:

> "The Court finds compelling circumstances for sealing the documents indicated below:  Jury Questionnaires containing personal sexual history of prospective jurors related to issues in this case.  The individual juror's right to privacy in this information greatly outweighs the public's right to access the court files."

(*Id*., Ex. 3 at 3 (quoting Clerk's Papers at 123).)  The order "authorized counsel to review the documents and makes copies without further order of the court, and provided that '[i]n the event of an application for the opening or copying of the sealed documents, notice shall be given or attempted . . . and hearing noted.'"  (*Id*. (quoting Clerk's Papers at 123.))  "No objection was lodged to this order."  (*Id*.)

Petitioner appealed the sealing ruling after trial, arguing structural error necessitating a new trial given the trial judge's failure to conduct the proper analysis prior to sealing.  (*Id*., Ex. 7 at 3.)  The Washington Court of Appeals agreed the trial judge erred in failing to conduct the proper analysis prior to sealing, but disagreed the error was structural, reasoning:

> . . . The questionnaires were used only for selection of the jury, which proceeded in open court.  The questionnaires were not sealed until several days after the jury was seated and sworn.  Unlike answers given verbally in closed courtrooms, there is nothing to indicate that the questionnaires were not available for

public inspection during the jury selection process. Thus, the subsequent sealing order had no effect on Coleman's public trial right, and did not "'create defect[s] affecting the framework within which the trial proceeds.'"

(*Id*. at 9.) The court noted petitioner did "not suggest any possible prejudice to him resulting from the order[,]" and concluded reversal was "not the remedy." (*Id*.) However, the appellate court remanded the case back to the trial court so that the proper analysis could be conducted and the sealing order reconsidered. (*Id*.)

The trial judge held a hearing on remand. (*Id*., Ex. 27.) The prosecution asked the Court to consider the privacy interests of the jurors and recommended partial redaction, while counsel for petitioner recommended redaction of juror names only. (*See id*. at 4-10.) The judge found compelling interests in juror privacy and in petitioner's right to a fair trial, explaining:

[T]he need for juror privacy is not only a fundamental fairness to the juror, who has no right to refuse to show up and once under oath has no right to refuse to answer these questions; but we need to advise jurors that this information will be held privately so that they will offer the information. If they refuse to offer that information, our ability to select a fair jury, one that does not have experience with sexual assault, for example, that opportunity of all of us to guarantee the defendant a fair trial will be lost. Because had we not told jurors, "We are using a questionnaire to protect your privacy and no one will have access to the questionnaire except for the lawyers and the court," had we not told them that, I am quite certain that jurors would have declined to be as forthright as they were. So in order to guarantee a fair trial by a fair jury, we have to try to make some promises to jurors.

(*Id*. at 10-11.)

The judge found the least restrictive means of redaction to be the removal of both juror names and juror numbers, given that inclusion of the numbers would allow for juror identification. (*Id*. at 11-13.) She found the interests of closure in order to protect the privacy

REPORT AND RECOMMENDATION
PAGE - 9

interests of the jurors to "far outweigh the interest of open access." (*Id*. at 13-14.)  The judge contrasted the limited nature of the responses compelled by the questionnaire, with the fact that those questions were subsequently "examined in open court[.]" (*Id*. at 14.)  Finally, the judge found the sealing order no broader in application or duration than necessary. (*Id*. at 14-15.)  The judge disagreed with defense counsel's argument that sealing prevented petitioner's family from participating in voir dire, again noting the jurors were questioned in open court. (*Id*. at 15-19.)

The judge also provided an opportunity for individuals to offer their objections to sealing the questionnaires. (*Id*. at 20-28.)  Petitioner's mother did not have a problem with redacting juror names and numbers, but stated "it would have been nice" if family members could have seen the questionnaires and had the opportunity to offer input to defense counsel for jury selection. (*Id*. at 20-22.)  Petitioner's father stated he "would have liked" for the questionnaires to remain open so that the family could have decided whether or not to pursue retaining a different attorney or explore other possibilities. (*Id*. at 22-23.)  One of petitioner's aunts felt that any jurors not comfortable in answering a public questionnaire should have been excluded from serving as a juror. (*Id*. at 23-25.)  Another aunt stated she had been molested as a child and would be able to discuss that fact in an open court, while a third aunt expressed a preference for open courts. (*Id*. at 25-27.)  Finally, petitioner's sister appeared to oppose sealing given the belief that any juror who answered "yes" to a question on the questionnaire "in most cases" would "not be able to make an unbiased decision." (*Id*. at 27-28.)  The judge, in response, explained that those jurors were questioned and subject to excusal for cause or by peremptory challenge. (*Id*. at 28-29.)  None of the individuals who objected to the sealing had attended voir dire. (*Id*., Ex. 3 at 7 and Ex. 27 at 20-23.)  Petitioner's parents were witnesses at trial and had been excluded from the courtroom until they gave their testimony. (*Id*.)

REPORT AND RECOMMENDATION
PAGE - 10

In considering petitioner's challenge to the order on remand, the Washington Court of Appeals found no error in its prior holding:

> In <u>Coleman I</u>, we reasoned that the sealing order did not affect Coleman's public trial right because there was indication the questionnaires were unavailable for public inspection during jury selection.  Coleman contends the record on remand establishes the questionnaires were not in fact available to the public, and therefore his public trial right was violated.
>
> Coleman relies on a statement on the questionnaire form and a declaration from his trial counsel submitted on remand.  The questionnaire states that the juror's responses are "available only to the judge, the defendant and the attorneys for both parties in the case," and that responses of selected jurors "will be sealed in the permanent case record and thus not be available for public scrutiny."  Counsel's declaration states:
>
>> To my knowledge, there was never a time that the questionnaires were available for public inspection during the jury selection process or at any other time during Mr. Coleman's trial.  To the contrary, it was my understanding that although I was entitled to use them in jury selection, these questionnaires were not to be made available for public inspection by myself or anyone else.
>
> Both parties apparently take the view that this evidence conclusively establishes the questionnaires were not available to the public during jury selection, and that this revelation makes the reasoning behind <u>Coleman I</u> "untenable."   We reject this conclusion, which is also inconsistent with our recent opinion in <u>State v. Tarhan</u>.
>
> The relevant facts in <u>Tarhan</u> are substantially similar to those here.  In both, voir dire occurred in open court and sealing order was not entered until after the jury was accepted.  But in <u>Tarhan</u>, trial counsel had requested to take the questionnaires home.  The court gave permission, despite concerns that it would be a "disaster" if jurors thought their information would be "Xeroxed and sent around town," stating that counsel were "officers of the court and I have such respect for all of you."  Tarhan argued this proved the questionnaires were never available for public inspection.

REPORT AND RECOMMENDATION
PAGE - 11

We rejected this argument:

It is unclear from this record whether the court's comments, read in context, represented a decision to deny public access to the completed questionnaires during voir dire.  What the exchange does show is that the court recognized that the jurors filled out the questionnaires with the expectation that their answers would be confidential. . . .

No one broached the subject of public access to the questionnaires during this colloquy. . . .  [O]n this limited record, we will not speculate on how the court would have ruled had anyone mentioned the question of public access to these questionnaires.  In sum, this colloquy between the court and counsel tells us little if anything about whether the questionnaires were unavailable to the public during voir dire of the venire in the following days of jury selection.

We also note that this record is silent on where these questionnaires were located during the selection of the jury following this colloquy.  This is a fact that would be important to any determination of whether the public had access to them.  Yet [Tarhan] fails to point to anything in this record to fill this void.

We held that Tarhan's failure to show the questionnaires were truly unavailable to the public during jury selection was "fatal to his claim that the court violated his public trial right."

The same is true here.  Neither the statement on the jury forms nor defense counsel's understanding can establish what the court would have done had there been a request from a member of the public to see the questionnaires, and there is no evidence about where the questionnaires were kept.  Like the <u>Tarhan</u> court, we decline to speculate about whether the trial court intended to treat the questionnaires as sealed before it actually sealed them.

(*Id*., Ex. 3 at 4-6; footnotes omitted.)   The court concluded petitioner failed to establish the

REPORT AND RECOMMENDATION
PAGE - 12

questionnaires "were truly unavailable to the public." (*Id*. at 6.)

The appellate court also considered petitioner's challenge to the trial court's hearing and subsequent written ruling on the sealing of the questionnaires, noting, *inter alia*:

> . . . The court identified two compelling interests. First, the court found that Coleman's right to a fair trial constituted a compelling interest in sealing the questionnaires because that right could be ensured only if prospective jurors were candid and forthright in their responses. The court also found juror privacy to be a compelling interest, to which public access to the questionnaires constituted a serious and imminent threat:
>
>> It is the unusual sexual assault victim who can hear a case similar to his/her personal experience and render an unbiased verdict. Without an assurance of some privacy, jurors would be less willing to make such disclosures, threatening the defendant's right to a fair trial. Jurors have a right of privacy in their sexual history. The only reason they are disclosing the information at all is that they are under oath and the court has ordered them to truthfully answer counsel's questions[.] Moreover, a juror's privacy is subject to far greater threat and abuse when the sensitive information is preserved as a court record, open to inspection, reproduction and publication to the world, than is the case with discussion in the courtroom . . . [which] is not as easily broadcast. The filing of confidential questionnaires, without any protection, presents a serious and imminent threat to the jurors' right of privacy.
>
> As to the objections lodged, the court considered the statements of Coleman's relatives but found the objections without merit because all persons present for voir dire heard far more details of the jurors' history than the questionnaires themselves revealed.
>
> The court found the least restrictive means for protecting juror privacy was to redact both names and juror numbers. Coleman argues the least restrictive means available was to redact only names, and that redaction of jury numbers renders the questionnaires "completely useless to anyone interested in the jury

REPORT AND RECOMMENDATION
PAGE - 13

selection process."   But the court explained that redacting only juror names would be insufficient:

> Court minutes record the name of the impaneled jurors, and these names could be connected with the questionnaires.   During jury selection, jurors were referred to by their juror number.   The transcript, as well as documents generated by the jury room, would connect juror numbers to the questionnaires. Thus, the least restrictive means to protect juror privacy and to encourage frank disclosure of juror information is to redact the questionnaires so that they cannot be connected to named jurors.

Coleman does not dispute this reasoning.   The court did not err.

> In weighing the compelling interests, the court found that the privacy rights of jurors and the need to encourage frank disclosure to assure a fair and unbiased jury greatly outweighed the "theoretical interest of court observers in connecting the juror's sexual history with the juror's name."

> Coleman contends the court improperly relied on a general concern that the juror's privacy could be compromised by members of the public with "prurient interests" rather than a serious and imminent threat to a compelling interest, as required by [State v.] Bone-Club and Presley v. Georgia.   During the hearing, the court did describe the public's interest in sexual assault cases as "possibly prurient."   This observation is not, however, part of the court's findings, which enumerate the compelling interests identified and the serious and imminent threat thereto.   This satisfies Bone-Club and Presley.

> Coleman next contends the court improperly made its ruling before it heard from individuals opposed to the sealing. That is not so.   Although the court orally addressed the Bone-Club factors and announced its "preferred method of dealing with this" before hearing from objectors present in the courtroom, it did not issue its written order for several days.   There was no error.

(Id. at 7-10; footnotes omitted.)

Nor does petitioner identify error in this habeas case.   The questionnaires were not sealed until after the completion of voir dire and the selection of the jury, and jurors were questioned on

REPORT AND RECOMMENDATION
PAGE - 14

the content of the questionnaires in open court.  Whatever language relating to access and public scrutiny the trial judge used in court or included on the questionnaires, there remains an absence of any showing the public was, in fact, precluded from viewing the questionnaires at any point prior to jury selection.  Nor does petitioner address the fact that no one, other than individuals designated as witnesses for trial, was precluded from attending the detailed questioning of the jurors in open court regarding the questionnaire content.  Finally, to the extent petitioner takes issue with the sealing of the questionnaires several days after jury selection, he fails to explain how this act implicated his constitutional rights.  *See generally Waller*, 467 U.S. at 46 ("The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions[.]  In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury.") (internal quotation marks and quoted sources omitted).  Petitioner, under these circumstances, does not demonstrate an infringement of his public trial rights.

Moreover, assuming the subsequent redaction of juror names and numbers constituted a partial closure implicating the public trial right, the trial court met its obligations.  The court identified substantial reasons for the partial closure, including the privacy rights of the jurors and petitioner's right to a fair trial.  The court narrowly tailored the closure to fit those substantial reasons, withholding from public view only the juror names and numbers.  The court articulated its reasons with findings specific enough to allow for review and determination as to the propriety of a partial closure.  The court likewise satisfied the procedural requirements by holding a hearing and allowing petitioner to be heard, making findings to support the partial

REPORT AND RECOMMENDATION
PAGE - 15

redactions, and considering reasonable alternatives, such as petitioner's suggestion that only juror names be redacted.

Petitioner, in sum, fails to demonstrate the state court's adjudication of his claim was contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court, or to otherwise demonstrate any violation of his constitutional rights. This Court should, therefore, deny habeas relief as to petitioner's first claim.

2.   Ground Two:

Petitioner argues, in his second ground for relief, a denial of his right to effective assistance of counsel when his attorney failed to object to improper remarks of the prosecutor during closing argument. He alleges impermissible vouching in the following statements:

> I want you to also think about what Tyler has gained from telling; from telling his mom, from being brought into a clinic and telling Dr. Wiester, from being brought in here telling Carolyn Webster, and then finally from being brought in here telling a roomful of strangers, his relatives and his uncle. Because if you can come up with anything you're doing better than me.

> The defendant's memory is what you would expect from somebody who has gone through it and mapped it out in order to be able to tell it to you.

> Children do not remember things as well as adults like the defendant and his parents who have rehearsed things down to the minute about what happened, for instance at the cabin.

> [TMB] shrugged his shoulder, which is what kids do sometimes when they didn't really want to answer. Shrugged his shoulders.

> We have to prove to you and we have proven to you by the word of a child.

(Dkt. 3 at 7; citations to record omitted.) Petitioner also alleges disparagement of defense counsel through the following:

REPORT AND RECOMMENDATION
PAGE - 16

Not, folks, what his attorney tried to make him say when he was on the stand that he was too embarrassed to talk about it. That's not what he told the police in February. When they were asking why didn't he mention it, he said I hadn't thought about it. It was only when he testified here and his attorney sort of directed him to say was it because you were embarrassed and the defendant answered yes. It's much different then I hadn't thought about it, which is what he gave the police as his excuse in February. . . .

(*Id.*; citation to record omitted.) Finally, petitioner identifies the following as inflammatory remarks:

And a kid who for all intents and purposes has been discarded by his family.

When he testified here there were relatives of his in the courtroom, including his elderly great grandparents. And he hadn't told them about the abuse. He never sat down and said this is what Travis did to me. And so he was in this courtroom for the first time talking about the defendant sucking his wiener in front of these people over there.

You will recall in voir dire that I asked you [to] think about your last sexual experience and I asked you to talk about it and not a single person in the room was willing to do it. Of course you had a choice and Tyler didn't.

When he was in here he was tasked with the duty that nobody in the room was willing to do during voir dire.

For all intents and purposes his [TMB's] family has tossed him aside.

You of course determine the credibility of Mr. Coleman's parents, who like any parents don't want to believe that their son could do something so heinous. Nobody can blame them for wanting to believe that. They don't know. They don't even know what [TMB] said, and it's sad that they too have chosen to throw [TMB] to the wolves.

He has become a child who will deal with sexual abuse for the rest of his life. Because, members of the jury, make no mistake, the effects of child abuse lasts far far longer than the act.

REPORT AND RECOMMENDATION
PAGE - 17

(*Id*. at 7-8; citations to record omitted.)

The Washington Court of Appeals first considered this claim in the context of prosecutorial misconduct:

> Coleman next contends the prosecutor committed misconduct during closing argument by inviting the jury to make negative inferences from Coleman's exercise of his constitutional rights and improperly bolstering TMB's credibility.
>
> To prevail on a claim of prosecutorial misconduct, Coleman must show that "the prosecutor's conduct was both improper and prejudicial in the context of the entire record and circumstances at trial." Prosecutorial misconduct does not constitute prejudicial error unless there is a "substantial likelihood the instances of misconduct affected the jury's verdict."
>
> When a defendant fails to object, request a curative instruction, or move for mistrial, the traditional rule is that the defendant has waived the issue for appeal unless the misconduct was "so flagrant and ill intentioned that no curative instruction could have obviated the resulting prejudice." In State v. Warren, however, the Washington Supreme Court left open the possibility that where misconduct directly violates a constitutional right, review may be had under the "manifest constitutional error" standard. Coleman relies principally upon State v. Jones, a case that applied the manifest constitutional error standard without comment. Both standards require a showing of prejudice, and Coleman has demonstrated none. Accordingly, it makes no difference to this case which standard applies.
>
> The prosecutor noted in closing argument that "the defendant was in the courtroom" when TMB testified, and "there were relatives of his in the courtroom," many of which had "tossed [TMB] aside" and "throw[n TMB] to the wolves." Coleman argues this improperly invited the jury to make negative inferences from his exercise of his Sixth Amendment right to confront witnesses and to have a public trial.
>
> In Jones, the prosecutor suggested in closing that the defendant's insistence on "staring" at the child victim belied his professed concern for her and so disturbed and frightened the witness that she refused to return to court. This court held that "the State's commentary constituted an impermissible use of

REPORT AND RECOMMENDATION
PAGE - 18

constitutionally protected behavior" and amounted to "error of constitutional magnitude." Coleman relies on <u>Jones</u>.

But this case is unlike <u>Jones</u>. There, the prosecutor's comments invited the jury to make negative inferences about the defendant (i.e., that he lied when he professed love and concern for the victim). Here, the prosecutor's remarks were based on evidence, not speculation, and did not involve Coleman's invocation of his right to trial. The prosecutor pointed out that TMB had been uncomfortable testifying about sexual abuse in front of strangers, Coleman, and his relatives, and had been more forthcoming when he spoke to the child interview specialist and the pediatrician. The thrust of the argument was about credibility, not Coleman's exercise of his rights. The argument was not improper.

Coleman also contends the prosecutor referenced facts outside the evidence in an attempt to "bolster TMB's credibility and lessen the jury's scrutiny of his testimony." In the portion of the argument to which Coleman refers, the prosecutor acknowledged that TMB was confused about whether the abuse at the cabin happened while he was living with his grandparents, and with whom he traveled to the cabin. The prosecutor then stated:

> He's a little kid. Children do not remember things as well as adults and certainly not as well as adults like the defendant and his parents who have rehearsed things down to the minute about what happened, for instance, at the cabin.
>
> It's natural that he's going to get some of these little details mixed up. It actually is more likely that a witness would have the little details mixed up than somebody who knows every single thing about what happened on what was at the time allegedly [an] uneventful trip.
>
> You can look at the quality of the witness's memory while testifying, and that's sort of what I was just talking about. [TMB's] memory is what you would expect of a nine or ten year old kid to remember. The defendant's memory is what you would expect from somebody who has gone through it and mapped it out in order to be able to tell it to you.

REPORT AND RECOMMENDATION
PAGE - 19

Coleman contends these remarks are similar to those held to be misconduct in State v. Boehning, where the prosecutor referred in closing argument to dismissed rape charges and to statements by the victim not admitted at trial, suggesting that the inadmissible statements supported the dismissed charges and were more reliable because they were obtained in a "safer environment" than open court.  Division Two of this court reversed, holding that the remarks asked the jury to infer that Boehning was guilty of crimes that had been charged but dismissed and "improperly appealed to the passion and the prejudice of the jury and invited the jury to determine guilt based on improper grounds.  The court also indicated that the prosecutor's argument improperly bolstered the victim's credibility by "arguing that [her inadmissible] out-of-court statements were consistent with her statements at trial and that she had disclosed even more" to investigators.

This case is not like Boehning.  Coleman contends the prosecutor improperly urged the jury to apply less scrutiny to TMB's testimony because children have poorer memories than adults.  But the fallibility of memory is a matter within the common knowledge of the jury, and TMB was able to offer details in the private interviews that he was unable to recall at trial.

Further, even if the argument were improper, Coleman made no objection at trial, and fails to show that an instruction would have been insufficient to cure any possible prejudice.

(Dkt. 31, Ex. 7 at 12-16; footnotes omitted.)

On collateral review, the Washington Court of Appeals addressed this claim within the context of ineffective assistance of counsel, specifically, petitioner's claim "that in various portions of oral argument, the prosecutor impermissibly vouched for the victim, disparaged defense counsel, and made inflammatory remarks."  (Id., Ex. 19 at 2.)  The court found that, although he relied on a new theory of ineffective assistance of counsel and identified "some different portions of oral argument," petitioner merely and impermissibly recast his misconduct claim as ineffective assistance.  (Id. at 2-3.)  The Washington Supreme Court reached the same conclusion, and added:

REPORT AND RECOMMENDATION
PAGE - 20

> . . . But even when the ineffectiveness claim is considered, Mr. Coleman fails to show that he is entitled to relief.  Whether to object to opposing counsel's closing remarks is a central aspect of a trial attorney's tactical thinking, an issue on which Mr. Coleman cannot establish ineffective assistance.  State v. Hendrickson, 129 Wn.2d 61, 77-78, 917 P.2d 563 (1996).  Moreover, even if counsel was somehow deficient in not objecting, Mr. Coleman fails to show that in light of the evidence there is a reasonable probability the jury would have acquitted him had counsel objected.  State v. McFarland, 127 Wn.2d 332, 335, 899 P.2d 1251 (1995).

(*Id.*, Ex. 21 at 1-2.)  Here, for the reasons discussed below, petitioner fails to demonstrate that the state court's consideration of his ineffective assistance claim entitles him to habeas relief.

The Sixth Amendment of the United States Constitution guarantees a criminal defendant the right to effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Courts evaluate claims of ineffective assistance of counsel under the two-prong test set forth in *Strickland*.  Under that test, a defendant must prove that (1) counsel's performance fell below an objective standard of reasonableness and (2) a reasonable probability exists that, but for counsel's error, the result of the proceedings would have been different.  *Id.* at 687-94.

When considering the first prong of the *Strickland* test, judicial scrutiny must be highly deferential.  *Id.* at 689.  There is a strong presumption that counsel's performance fell within the wide range of reasonably effective assistance.  *Id.*  The Ninth Circuit Court of Appeals has made clear that "'[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'"  *Campbell v. Wood*, 18 F.3d 662, 673 (9th Cir. 1994) (quoting *Strickland*, 466 U.S. at 689).

The second prong of the *Strickland* test requires a showing of actual prejudice related to counsel's performance.  In order to establish prejudice, a petitioner "must show that there is a

REPORT AND RECOMMENDATION
PAGE - 21

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

The reviewing court need not address both components of the inquiry if an insufficient showing is made on one component.  *Id.* at 697.  Furthermore, if both components are to be considered, there is no prescribed order in which to address them.  *Id.*

Where a state court rejected an ineffectiveness claim on the merits the "pivotal question" in a § 2254 proceeding "is whether the state court's application of the *Strickland* standard was unreasonable."  *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct 770, 785 (2011) (citations omitted).  The Court employs a "'doubly deferential'" review, taking a "'highly deferential' look at counsel's performance [pursuant to *Strickland*, and] through the 'deferential lens of 2254(d).'" *Pinholster*, 131 S. Ct. at 1403 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 121 n.2 and 123 (2009), and *Strickland*, 446 U.S. at 689).  A petitioner, therefore, "must demonstrate that it was necessarily unreasonable" for the state court to rule as it did.  *Id.*

"Because many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct." *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993). Attorneys commonly refrain from objecting during closing to avoid highlighting the remarks of the opposition. *Cunningham v. Wong*, 704 F.3d 1143, 1159 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 169, 187 L. Ed. 2d 116 (2013).

Petitioner, first, asserts ineffectiveness through the failure to object to prosecutorial vouching.  "As a general rule, a prosecutor may not express his opinion of the defendant's guilt

REPORT AND RECOMMENDATION
PAGE - 22

or his belief in the credibility of government witnesses." *United States v. Molina*, 934 F.2d 1440, 1444-45 (9th Cir. 1991). "Such prosecutorial vouching, which consists of either placing the prestige of the government behind the witnesses through personal assurances of their veracity or suggesting that information not presented to the jury supports the witnesses' testimony, is improper." *Id*. at 1445. At the same time, however, "the prosecution must have reasonable latitude to fashion closing arguments[,]" and "[i]nherent in this latitude is the freedom to argue reasonable inferences based on the evidence." *Id*.

Here, in the remarks targeted by petitioner, the prosecutor reasonably asked the jury to draw on its common knowledge of the difficulty children have recalling details, speaking in front of strangers, and talking about sexual or other matters about which they might be embarrassed or ashamed. The remarks neither placed the prestige of the government behind the witness through personal assurances of veracity, nor suggested that information not presented to the jury supported the testimony. Petitioner, as such, fails to demonstrate the prosecutor engaged in improper vouching warranting an objection by his counsel.

Nor does petitioner demonstrate ineffective assistance in relation to any of the other closing remarks of the prosecutor. Improper argument does not, per se, violate a defendant's constitutional rights." *Jeffries v. Blodgett*, 5 F.3d 1180, 1191 (9th Cir. 1993). "[I]t 'is not enough that the prosecutors' remarks were undesirable or even universally condemned.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoted source omitted). The question is whether it can be said the "prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id*. (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). In assessing the claim, the Court must examine the entire proceedings and place the prosecutor's statements in context. *See Greer v. Miller*, 483 U.S. 756,

REPORT AND RECOMMENDATION
PAGE - 23

765-66 (1987).  *See also Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 898 (9th Cir. 1996) ("The arguments of counsel are generally accorded less weight by the jury than the court's instructions and must be judged in the context of the entire argument and the instructions.") (citing *Boyde v. California*, 494 U.S. 370, 384 (1989)).

The remarks petitioner construes as disparaging his counsel occurred within the prosecutor's discussion of inconsistencies in statements made by petitioner at different times. The inconsistencies included, for example, statements petitioner made as to why he did not initially mention to the police he had cupped the victim's genitals, originally claiming he had not thought of it, then later claiming he was embarrassed.  (Dkt. 31, Ex. 26 at 15-19.)  The prosecution began this argument by stating:  "So what are the defendant's excuses for what happened?  His excuses for why all these things have been blamed on him?  There's several versions of his excuses so we're going to go through them one by one."  (*Id*. at 15.)  Considered in this context, the prosecutor's statements are, as respondent argues, reasonably construed as challenging petitioner's credibility, rather than disparaging defense counsel.  "In a case that essentially reduces to which of two conflicting stories is true, it may be reasonable to infer, and hence to argue, that one of the two sides is lying."  *Molina*, 934 F.2d at 1445 (citations omitted). Also, when viewed in light of the record as a whole, the prosecutor's references to defense counsel in a brief portion of his closing remarks cannot be said to have so infected the trial with unfairness as to result in a denial of due process.  *See*, *e.g.*, *United States v. Tarrazon*, 989 F.2d 1045, 1053 (9th Cir. 1993) (finding a "singular, somewhat ambiguous comment does not constitute a miscarriage of justice or an affront to the integrity of the judicial process."); *Hall v. Whitley*, 935 F.2d 164, 165-66 (9th Cir. 1991) (dismissing prosecutorial misconduct claim where prosecutor's remarks were "isolated moments in a three day trial.")

REPORT AND RECOMMENDATION
PAGE - 24

1   Petitioner likewise fails to support his ineffectiveness claim in relation to the series of

2 allegedly inflammatory remarks.  It is improper for a prosecutor to "indulge[] in an appeal

3 wholly irrelevant to any facts or issues in the case, the purpose and effect of which could only

4 have been to arouse passion and prejudice."  *Viereck v. United States*, 318 U.S. 236, 247-48

5 (1943).  *See also United States v. Weatherspoon*, 410 F.3d 1142, 1149-52 (9th Cir. 2005) ("We

6 have consistently cautioned against prosecutorial statements designed to appeal to the passions,

7 fears and vulnerabilities of the jury[.]")

8   In this case, many of the remarks at issue addressed the difficulties the victim had in

9 testifying in court, in front of relatives who did not believe his allegations, and on the

10 challenging subject matter of sexual abuse.  (*See, e.g.*, Dkt. 31, Ex. 26 at 10-15, 20-24.)  For

11 example, in referencing the fact that no jury member, during voir dire, had been willing to talk in

12 open court about their sexual experiences, the prosecutor noted the victim was tasked with that

13 very duty and was "mortified" in so doing.  (*Id.* at 13, 22.)  Also, in describing the far reaching

14 effects of sexual abuse, the prosecutor pointed to evidence showing the effects on the victim's

15 sexual development, emotional health, and family relationships.  (*See, e.g.*, *id.* at 4 (the victim

16 "for all intents and purposes has been discarded by his family[,]" "now masturbates and he feels

17 guilty[,]" and believes he is to blame for the crimes committed against him).)  None of the

18 remarks are reasonably construed as intended only to arouse the passion and prejudice of the

19 jury.  The remarks, instead, were relevant to the facts and issues and based on the evidence in the

20 case.  Nor can it be said that, when viewed in light of the record as a whole, these remarks so

21 infected the trial with unfairness as to result in a denial of due process.

22   Petitioner, in sum, does not demonstrate his counsel's failure to object to remarks of the

23 prosecutor in closing argument amounted to performance falling below an objective standard of

REPORT AND RECOMMENDATION
PAGE - 25

1   reasonableness or that, but for his counsel's failure to object, the result of the proceedings would

2   have been different.  Because the state court's adjudication of this claim was neither contrary to,

3   nor an unreasonable application of clearly established federal law as determined by the United

4   States Supreme Court, this Court should deny habeas relief as to petitioner's second claim.

5       3.   Ground Three:

6       Petitioner's third ground for relief challenges the failure of the prosecution to provide

7   defense counsel with a mirror image of the hard drive seized from petitioner's residence which

8   was alleged to contain "'footprints of child pornography.'"  (Dkt. 3 at 8-9.)  He states that his

9   attorney received only a printout of a single directory contained on the hard drive.

10      As held by the United States Supreme Court in *Brady v. Maryland*, 373 U.S. 83, 87

11  (1963), the Constitution requires the prosecutor to disclose evidence to the defense that is both

12  favorable to the accused and material either to guilt or punishment.  *United States v. Bagley*, 473

13  U.S. 667, 674 (1985).  *Accord Banks v. Dretke*, 540 U.S. 668, 690 (2004), and *Strickler v.*

14  *Greene*, 527 U.S. 263, 281-82 (1999).  Evidence is material if there is a reasonable probability

15  that, had the evidence been disclosed, the result of the proceeding would have been different.

16  *Bagley*, 473 U.S. at 682.

17      There is, however, "no general constitutional right to discovery in a criminal case, and

18  *Brady* did not create one[.]" *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977).  *See also Gray v.*

19  *Netherland*, 518 U.S. 152, 168 (1996) ("We have said that 'the Due Process Clause has little to

20  say regarding the amount of discovery which the parties must be afforded.'") (quoting *Wardius*

21  *v. Oregon*, 412 U.S. 470, 474 (1973)).  Discovery in criminal cases is ordinarily a matter of state

22  law, the violation of which does not provide a basis for federal habeas relief.  *Coleman v.*

23  *Calderon*, 150 F.3d 1105, 1112 (9th Cir. 1998) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68

REPORT AND RECOMMENDATION
PAGE - 26

(1991)), *rev'd on other grounds, Calderon v. Coleman*, 525 U.S. 141 (1998).  In Washington, criminal case discovery is governed by court rule, and enforcement of the parties' discovery obligations is subject to the trial court's discretion.  Washington Superior Court Criminal Rule (CrR) 4.7; *State v. Gregory*, 158 Wn.2d 759, 822, 147 P.3d 1201 (2006), *overruled in part on other grounds*, *State v. W.R.*, 181 Wn.2d 757, 336 P.3d 1134 (2014).

In this case, the record reveals that defense counsel requested the mirrored hard drive in discovery, that the prosecutor responded with a request for an empty hard drive so that a copy could be made, and that no empty hard drive was provided by the defense.  (*See* Dkt. 31, Ex. 17, Appx. C and Ex. 16, Appx. D at 47-54.)  As respondent observes, there is no indication defense counsel had retained an expert to examine the hard drive or made any further attempts to litigate the issue until after the trial began, when defense counsel asked that the computer evidence be suppressed based on the prosecution's failure to provide a copy of the hard drive.  (*See id*., Ex. 19 at 4 and Ex. 16, Appx. D at 47-54.)

The record, given these facts, does not establish the prosecutor improperly withheld favorable, material evidence in violation of *Brady* or otherwise violated petitioner's constitutional rights.  The evidence, instead, reflects that the prosecution provided petitioner with an opportunity to obtain a copy of the hard drive in discovery and that that opportunity was not pursued.  Petitioner, moreover, no more than speculates as to a material effect on his defense, or as to prejudice resulting from his failure to receive a copy of the hard drive.

The state court reached these same conclusions in considering petitioner's claims:

> Relying on <u>State v. Boyd</u>, 160 Wn.2d 424, 158 P.3d 54 (2007), Coleman argues that the trial court erred in failing to order the State to provide the defense with a mirror image of his seized computer hard drive.  When Coleman first talked to the police, he authorized them to analyze his computer.  The police instructed

Coleman not to turn on or do anything with the computer in the interim.   When they returned, however, Coleman's desktop computer was unplugged and had been moved to a different location.   Upon investigation, detectives determined that the computer hard drive had been wiped.   Nevertheless, they were still able to detect traces on the hard drive which indicated that the computer had been used to view child pornography.

During discovery, Coleman requested that the State provide a mirror image of his hard drive.   The State responded to the request, and agreed to make such a copy if Coleman provided an empty hard drive to copy onto.   Coleman did not provide a hard drive, nor did he move to compel discovery or object to the State's position that the cost or duplication should be allocated to the defense.   Instead, the defense brought up the issue several months later at the beginning of trial and argued that the State's computer evidence should be suppressed.

The consolidated cases in <u>Boyd</u> involved child pornography charges.   The Supreme Court held that under CrR 4.7(a), the State was obligated to provide a mirror image of seized hard drives to enable the defense to conduct independent forensic analysis.   <u>Boyd</u>, 160 Wn.2d at 429-30.   Given the nature of the charges and the State's evidence, the need for such analysis was pivotal to the defense's ability to prepare for trial.   <u>Boyd</u>, 160 Wn.2d at 436-7.   In contrast here, Coleman was not charged with child pornography crimes, nor is there any indication he had retained or intended to consult an independent forensic analyst. More fundamentally, nothing in <u>Boyd</u> suggests that a discovery violation occurred here since the State agreed to provide the evidence, but only did not agree to pay for it.   The court in <u>Boyd</u> discussed at considerable length appropriate protections that should be in place when computer hard drive evidence is copied and provided to defense, including the fact that the defense should be obligated to pay the "reasonable cost of duplication."   <u>Boyd</u>, 160 Wn.2d at 438.   Here, the defense did not move for an order to compel or timely provide the court with an opportunity to rule on the appropriate allocation of costs and Coleman offers no more than speculation about how the evidence may have been helpful to his case.   He cannot establish error, much less error that resulted in a complete miscarriage of justice.

(Dkt. 31, Ex. 19 at 3-5.)  Because petitioner fails to demonstrate that the state court's decision was

contrary to or an unreasonable application of clearly established federal law as determined by the

REPORT AND RECOMMENDATION
PAGE - 28

United States Supreme Court, his third ground for habeas relief should also be denied.

C.     Certificate of Appealability

A petitioner seeking post-conviction relief under § 2254 may appeal a district court's dismissal of his federal habeas petition only after obtaining a certificate of appealability (COA) from a district or circuit judge.   A COA may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right."   *See* 28 U.S.C. § 2253(c)(2).   A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."   *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).   Under this standard, the Court concludes that petitioner is not entitled to a COA with respect to his claims.

CONCLUSION

The Court recommends that petitioner's habeas petition be DENIED and this case DISMISSED.   An evidentiary hearing is not required as the record conclusively shows that petitioner is not entitled to relief.    A proposed Order accompanies this Report and Recommendation.

DEADLINE FOR OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and Recommendation is signed.   Failure to file objections within the specified time may affect your right to appeal.   Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed.   Responses to objections may be filed within **fourteen (14) days** after service of objections.   If no timely objections are filed, the matter will

REPORT AND RECOMMENDATION
PAGE - 29

be ready for consideration by the District Judge on **April 17, 2015**.

DATED this 1st day of April, 2015.

Mary Alice Theiler
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 30